PEARSON, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| BOARD OF COMMISSIONERS FOR TRUMBULL COUNTY, OHIO, | ) ) ) | CASE NO.  4:09CV0249 |
| Plaintiff, | ) ) | |
| v. | ) ) | JUDGE BENITA Y. PEARSON |
| VILLAGE OF LORDSTOWN, OHIO, *et al.*, | ) ) | **MEMORANDUM OF OPINION AND ORDER** |
| Defendants. | ) | [Resolving ECF Nos. 40, 46, 72, and 77] |

Pending are Defendant City of Warren's Motion for Summary Judgment (ECF No. 40),

Plaintiff's Motion for Summary Judgment Against the City of Warren (ECF No. 46), Plaintiff's

Modified Motion for Summary Judgment Against the Village of Lordstown, Ohio (ECF No. 72),

and Defendant Village of Lordstown, Ohio's Motion for Summary Judgment (ECF No. 77).  The

Court has been advised, having reviewed the record, the parties' briefs and certificates, and the

applicable law.[1]  The Court has also considered the oral arguments of counsel offered during the

---

[1]  The Court notes that the Order (ECF No. 58) entered on February 1, 2011 provides in pertinent part:

> Lead counsel of record for all parties shall confer with one another in person in order to prepare written stipulations as to all uncontested facts to be presented by the cross-motions for summary judgment.  The stipulations shall be filed with the Court on or before **February 28, 2011**.

(Emphasis in original).  *Id.* at PageID #: 1259.  Despite this order, stipulated facts were not filed.  The Court, however, has, when able, given credence to facts obviously not in dispute.  The parties also did not file a joint certificate containing a stipulation as to the undisputed facts in compliance with the Order (ECF No. 89) entered on December 19, 2012.  *Id.* at PageID #: 3901.

(4:09CV0249)

motion hearing held on the record.  For the reasons provided below, the City's motion and the

Village's motion are granted and Plaintiff's motions against the City and the Village are denied.

## I.  Background

This is a dispute over whom may provide sanitary sewer service in a particular area of the

Village of Lordstown.

Plaintiff, the Commissioners for Trumbull County, Ohio passed resolutions in the 1950s:

establishing Lordstown Sewer District No. 1 for the Township of Lordstown; approving a general

plan for a sewerage improvement system for the district; and instructing the County Sanitary

Engineer to prepare detail plans for construction of the improvement.

In 1964, the County approved detail plans for the 36-inch trunk sewer line known as the

Lordstown Interceptor Sewer ("LIS").  In the mid-1960s, the County constructed the LIS to bisect

the Township and serve as the backbone of a sewer improvement sufficient to meet the

Township's long-term needs.  The purpose of passing the resolutions in the 1950s was to serve

the Township community and the then new General Motors ("GM") Assembly plant, with a

prediction that population would increase from an estimated 1365 residents in 1964 to an

estimated 8750 residents by 1975, after the improvement was completed with extensions to serve

the entire service area.  The LIS traverses diagonally thru Lordstown, basically bisecting the

Village, starting from GM's plant and running north/northeast to the point where it leaves the

Village and connects to a large sewer main owned by the City.

In 1972, the Commissioners then passed a resolution consolidating Lordstown Sewer

District No. 1 and approximately 16 other surrounding small sewer districts, including the Mud

2

(4:09CV0249)

Creek Sewer District, into a large sewer district, known as the Trumbull County Metropolitan

Sewer District ("MSD"), whose boundaries included all of the Township.  ECF No. 67-40; ECF

No. 49 at PageID #: 2986-88.  As of April 2010, the MSD had approximately 10,300 residential

and commercial customer accounts.  ECF No. 50 at PageID #: 3300.  GM's Lordstown Assembly

Plant is the largest customer of the County's MSD, accounting for 15-20% of the annual revenue.

In 1975, the Township incorporated as the Village of Lordstown.   In 1977, the Village

adopted the County's subdivision regulations for construction of new sewer lines, including

therein a section stating the County's authority and jurisdiction over the design, review,

construction, inspection, and enforcement of all public sewers within the Village.

The County and the Village were parties to an agreement, by which they adopted

counterpart ordinances to divide responsibilities for construction of sewer extensions, stating

therein that the County's Sanitary Engineer had authority over the design, construction,

inspection and maintenance of all sewer lines in the Village, and that a sewer extension

agreement had to be executed for each project.  The Village and the County entered into 16

separate private sewer extension agreements between 1984 and 2007, pursuant to which they

agreed to terms and conditions for the construction and subsequent operations and maintenance

("O&M") of extensions to be connected to the County's LIS.  *See* ECF No. 67-6 and 67-7.  Each

extension agreement restated the County's authority and transferred ownership to the County

upon completion of the project.

(4:09CV0249)

In May 2003, the Village's Solicitor sent a letter to the County Sanitary Engineer stating that the private extension agreement is a "form agreement[ ]" that "exists by <u>mandate</u>" between the Commissioners and the Village. ECF No. 67-9 at PageID #: 1758 (underlining in original).

The County and the City of Warren entered into an agreement in December 1998,[2] pursuant to which the City agreed to accept for treatment wastewater from the Lordstown portion of the County's MSD, delivered *via* the LIS collection system with an expiration date of December 31, 2017. ECF No. 46-8. The 1998 Agreement contains three (3) primary provisions: 1) that "[t]he City will accept and receive into its sewerage system, and will treat and dispose of, the sewage from within said Warren-Champion and Lordstown sewer subdistricts" (ECF No. 46-8 at PageID #: 1056, ¶ 2); 2) that the agreement "may be extended" beyond the areas delineated as comprising the sewer districts (ECF No. 46-8 at PageID #: 1056, ¶ 4); and 3) sewage flows "may be increased, provided both parties agree that existing service is not impaired" (ECF No. 46-8 at PageID #: 1056, ¶ 5).

The County's MSD is indebted under a USDA loan program for three completed or pending capital sewer projects with a total outstanding balance, as of February 2010, of approximately $3.4 million. ECF No. 46-17.[3] The County is also subject to a judicial consent order, dated January 12, 2007 (ECF No. 46-16), which mandates construction of sewers to stop

---

[2] The City refers to this Agreement as the 1997 Agreement in ECF Nos. 40 and 92 because its effective date was January 1, 1997, although it was executed in 1998.

[3] Specifically, the County obtained $3,430,000 from USDA loans: $1,856,000.00 for the Hilltop Sanitary Sewer Project (2003); $900,000.00 for the Shannon Road Sanitary Sewer Project (2006); and, $674,000.00 for the McKinley Heights Phase II Sanitary Sewer Project (2008), all inside the County's MSD.

(4:09CV0249)

unsanitary conditions in nine areas located inside the County's MSD, totaling an estimated $50-$55 million in future capital costs.  ECF No. 50 at PageID #: 3290-92.

The Eastgate Regional Council of Governments ("ERCOG") is the Ohio EPA-designated agency with jurisdiction over centralized wastewater planning in Mahoning and Trumbull Counties.  With the consent of the County, the Village and the City, the ERCOG General Policy Board passed a Resolution, dated July 31, 2006, to change the designated destination for transport of sewage from the southern part of the Village's East Side Sanitary Sewer Project ("ESSP") area from Mahoning County's Meander wastewater treatment plant to the City's treatment plant.  ECF No. 67-48.

After some preliminary meetings between County officials and Village officials that raised concerns for the Village officials, the Village enacted an ordinance creating its own sewer district in June, 2007.  ECF No. 67-24.  The Village subsequently paid for the necessary work to plan and design the ESSP, let out the construction contracts, pay for it, operate it, and collect the sewer rents.  ECF No. 77-2 at PageID #: 3530, ¶ 4.

The Village employed the engineering firm of CT Consultants to prepare a report entitled "Preliminary Engineering Report – Sewering the Eastside of the Village of Lordstown," dated February 2007.  The report proposed extensions to serve the last unsewered part of the east side of the Village, to be connected to the County's LIS where its crosses Highland Avenue. Plaintiff's Exhibit 31 with oversized "Exhibit III" to the Deposition of Rex Fee; *see* Plaintiff's Notice of Manual Filing (ECF No. 68).  It was submitted to the Ohio Environmental Protection Agency ("Ohio EPA") in late February 2007.  While the Village did not provide a copy of the

5

(4:09CV0249)

report to the County before sending it to Ohio EPA, the Village did consult with the County's

Health Department regarding the ESSP.  ECF No. 67-3 at PageID #: 1615.  On June 8, 2007, CT

Consultants submitted to Ohio EPA a permit-to-install (PTI) application and engineering

drawings for the Village's proposed construction of the ESSP.  ECF No. 67-22.  The Village did

not disclose its application to the County, nor did it provide the County a copy in conjunction

with, or after, its submittal to Ohio EPA.  ECF No. 67-3 at PageID #: 1617.  The Village did not

disclose in its application that it did not present the engineering plans to the County for its

approval.  ECF No. 67-3 at PageID #: 1617.  The application submitted to Ohio EPA modified

the Village's preliminary engineering plans by proposing (1) a direct connection of the new

extension lines to a sewer main of the City rather than to the County's LIS, (2) boring under the

Ohio Turnpike to construct extension lines to serve the Imperial Mobile Home Park, and (3)

approximately 9,400 feet of new extension lines designed to serve GM's Lordstown Assembly

Plant.[4]  *Compare* Plaintiff's Exhibit 31 with oversized "Exhibit III" to the Deposition of Rex Fee

with ECF No. 67-22 (showing the differences between the 2007 preliminary engineering plans

and the plans ultimately submitted with the PTI application to Ohio EPA in order to obtain

construction approval).  Thereafter, the Village obtained construction approval from the Ohio

EPA for the ESSP.  ECF No. 67-23.

---

[4] "The Village is entirely aware that while the County has qualifying loans
outstanding it cannot take General Motors as a customer unless the County consents."
ECF No. 77 at PageID #: 3482.  Moreover, GM's Lordstown Plant does not lie within the
service area of the ESSP.  Exhibit AAAA to Affidavit of Lesley Gordon; *see* Village's
Notice of Manual Filing (ECF No. 78).

(4:09CV0249)

The Village constructed the ESSP at a cost exceeding $11,800,000.  It obtained loans of

approximately $10,800.00 to pay for the project.  ECF No. 77-2 at PageID #: 3530, ¶ 4. The

ESSP provides sewer service to the relatively few customers in the disputed area.  As of April

2010, there were approximately 300 connections in the ESSP, including a mobile home park.[5]

ECF No. 50 at PageID #: 3300.

While still a party to the 1998 Agreement it has with the County, the City entered into a

2007 treatment contract with the Village agreeing to accept effluent and sewage for treatment

from the new lines constructed by the Village in the same geographical area from which the City

had already agreed to accept wastewater for treatment delivered to the City from the County's

LIS sewerage system.  ECF No. 46-6.  And in 2009, the City and the Village entered into a

second contract for the City to provide O&M services to the Village for the new sewer lines and

pump stations in the ESSP service area.  ECF No. 46-9.

Plaintiff's Exhibit 41 to the Deposition of Rex Fee[6] is a colored map prepared by Plaintiff

depicting (1) the location of the County's LIS in green, (2) approximate boundaries of the

Village's ESSP area in two areas denoted with red crosshatch, (3) the location of the new ESSP

---

[5]  There are approximately 250-300 residents in the Imperial Mobile Home Park.
In December 2013, the owner of the Imperial Mobile Home Park received an approved
Ohio EPA Permit to Install (ECF No. 104-1), which was the subject of Plaintiff's Request
for Status/Pretrial Conference (ECF No. 104).  The permit allows the owner of the mobile
home park (who currently is a Council Member of the Village) to
dismantle/decommission the existing wastewater treatment plant and construct manholes
and sanitary sewer lines to connect to the ESSP (rather than the County's existing sanitary
sewer lines located directly across the street from the front entrance to the Imperial
Mobile Home Park).

[6]  *See* Plaintiff's Notice of Manual Filing (ECF No. 47).

7

(4:09CV0249)

extension lines constructed by the Village in orange, (4) 34 sewer extension agreements executed

between 1964 and 2007 for projects extending lines out from the LIS, and (5) the location of

previous sewer extensions connecting to the LIS, shown in blue and yellow.

On March 31, 2008, Plaintiff filed a Verified Complaint for Declaratory and Injunctive

Relief (ECF No. 1-2) against the Village and the City in the Trumbull County, Ohio Court of

Common Pleas, being Case No. 2008 CV 01044.  On January 23, 2009, Plaintiff filed a First

Amended Verified Complaint for Declaratory and Injunctive Relief (ECF No. 1-6) that added

three new federal claims.  Defendants removed the case to this Court on February 3, 2009, on the

basis of federal question jurisdiction.[7]

Plaintiff is pursuing ten causes of action against Defendants:  First—declaratory and

injunctive relief regarding the Village's actions; Second—declaratory relief regarding the City's

actions; Third—declaratory relief regarding the impact of the ERCOG's July 2006 amendment to

the Clean Water Act § 208 Area Wide Water Quality Management Plan; Fourth—declaratory and

injunctive relief regarding Plaintiff's rights under Ohio Rev. Code Ch. 6117 over the ESSP;

Fifth—breach of contract by the City; Sixth—breach of contract by the Village;

Seventh—injunctive relief against the Village and the City; Eighth—7 U.S.C. §1926(b);

Ninth—42 U.S.C. § 1983; and Tenth—an award under 42 U.S.C. § 1988 against Defendants of

attorney's fees and expenses incurred to protect and preserve Plaintiff's federal rights.

---

[7] On January 21, 2011, the above-entitled action was reassigned from Judge
Christopher A. Boyko to the undersigned pursuant to General Order 2011-4.

(4:09CV0249)

## II.  Standard of Review

Summary judgment is appropriately granted `when the pleadings, the discovery and disclosure materials on file, and any affidavits show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Johnson v. Karnes*, 398 F.3d 868, 873 (6th Cir. 2005).  The moving party is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party must "show that the non-moving party has failed to establish an essential element of his case upon which he would bear the ultimate burden of proof at trial."  *Guarino v. Brookfield Twp. Trustees.*, 980 F.2d 399, 403 (6th Cir. 1992).

Once the movant makes a properly supported motion, the burden shifts to the non-moving party to demonstrate the existence of a genuine dispute.  An opposing party may not simply rely on its pleadings; rather, it must "produce evidence that results in a conflict of material fact to be resolved by a jury."  *Cox v. Ky. Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).  The non-moving party must, to defeat the motion, "show that there is doubt as to the material facts and that the record, taken as a whole, does not lead to a judgment for the movant."  *Guarino*, 980 F.2d at 403.  In reviewing a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party when deciding whether a genuine issue of material fact exists.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).

9

(4:09CV0249)

The United States Supreme Court, in deciding *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986), stated that in order for a motion for summary judgment to be granted, there must be no genuine issue of material fact. *Id.* at 248.  A fact is "material" only if its resolution will affect the outcome of the lawsuit.  In determining whether a factual issue is "genuine," the court must decide whether the evidence is such that reasonable jurors could find that the non-moving party is entitled to a verdict. *Id.*  Summary judgment "will not lie . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*  To withstand summary judgment, the non-movant must show sufficient evidence to create a genuine issue of material fact. *Klepper v. First Am. Bank*, 916 F.2d 337, 342 (6th Cir. 1990).  The existence of a mere scintilla of evidence in support of the non-moving party's position ordinarily will not be sufficient to defeat a motion for summary judgment. *Id.*

### III.  Analysis

**A.  The City's Motion for Summary Judgment**

The issue presented by the cross-motions for summary judgment of the City and Plaintiff is whether the City has breached a water meter agreement for sewage output services between the County and the City that has been in place since 1997.  The crux of Plaintiff's claims against the City is that by entering the 2007 Agreement with the Village to accept sewage from Lordstown's ESSP for treatment and disposal, the City breached its 1998 Agreement with the County, violated 7 U.S.C. § 1926(b), and took actions that are tantamount to destruction of the County's MSD.

10

(4:09CV0249)

**1. Whether the City acted with authority under the Ohio Constitution when it entered the 2007 and 2009 Agreements with the Village.**

The City argues that it had constitutional authority to enter the 2007 (ECF No. 46-6) and

2009 (ECF No. 46-9) Agreements with the Village, just as it was authorized to enter the 1998

Agreement (ECF No. 46-8) with the County.  It contends that it can concurrently perform its

obligations under both agreements.

The Ohio Constitution grants to a municipality the power to provide water services to its

residents.  Article XVIII, Section 4, of the Ohio Constitution, part of the "municipal home rule"

amendments, provides:

> Any municipality may acquire, construct, own, lease and operate within or without its corporate limits, any public utility the products or service of which is or is to be supplied to the municipality or its inhabitants, and may contract with others for any such product or service.  The acquisition of any such public utility may be by condemnation or otherwise, and a municipality may acquire thereby the use of, or full title to, the property and franchise of any company or person supplying to the municipality or its inhabitants the service or produce of any such utility.

"While Ohio courts have referred to this constitutional grant of authority as 'exclusive,' the same

courts have routinely held that a statute enacted to promote the health, safety and welfare of the

public trumps this constitutional grant if the statute does not substantially interfere with the

municipality's power."  *Village of Grafton v. Rural Lorain County Water Authority*, 316 F.

Supp.2d 568, 577 (N.D. Ohio 2004) (Polster, J.), *aff'd*, 419 F.3d 562 (6th Cir. 2005).

**2. Whether Plaintiff can prevail on its declaratory judgment action when the City has not taken any action to destroy the County's MSD.**

The City next argues Plaintiff is not entitled to declaratory or injunctive relief.  According

to the City, it is not attempting to exercise eminent domain or otherwise destroy the County's

11

(4:09CV0249)

sewer system.  The 1998 Agreement between the County and the City (ECF No. 46-8) remains

intact.

Plaintiff seeks to hold the City responsible for a decrease in sewer loads as a result of the

Village's establishment of its own municipal sewer district.  Plaintiff bases its request for relief

on *Northwood v. Wood Cty. Regional Water & Sewer Dist.*, 86 Ohio St.3d 92 (1999), a case of

eminent domain.  *See* ECF No. 1-2 at PageID #: 20, ¶ 34.  According to Plaintiff, there is nothing

in *Northwood* that suggests that the Court's holding is limited only to the power of eminent

domain, and does not apply broadly to other exercises of municipal authority, including the

authority to enter into contracts.  In *Northwood*, the Ohio Supreme Court framed the issue

presented as "whether a municipality may exercise eminent domain over public utility facilities

owned by a regional water and sewer district."  *Id.* at 93.  The court held "that such an exercise of

eminent domain is constitutional as long as the water and sewer district is not thereby destroyed."

*Id.*  The Court agrees with the City that *Northwood* is irrelevant to the case at bar because the

City is not attempting to exercise eminent domain over the County's sewer system.  ECF No. 40

at PageID #: 701.  The Court discusses *Northwood* further in Section B.1., *infra*.

**3. Whether the City breached the 1998 Agreement with the County.**

While Plaintiff argues the City has breached the express terms of the 1998 Agreement

(ECF No. 46-8), it does not identify any specific provision that the City has breached.  Instead,

the County makes a general allegation that because the City is obligated to treat and dispose of

sewage from the County's sewer district at specified prices, entering the 2007 Agreement with

12

(4:09CV0249)

the Village with higher prices (ECF No. 46-6) violates that obligation.  ECF No. 46 at PageID #: 981-84.

The City argues it has not breached its agreement with the County.  It will continue to honor its obligations under the 1998 Agreement.  The City correctly notes there is no exclusivity or non-compete language in the 1998 Agreement that prevented it from entering the 2007 Agreement with the Village.  When entering the 1998 Agreement, the County could have included language in the agreement to protect its future interest in servicing Lordstown's east side.  There is no legal or factual basis to read such language into the 1998 Agreement, as Plaintiff asks the Court to do as a pretext to arguing a breach of contract occurred.

"[A] court 'is not permitted to alter a lawful contract by imputing an intent contrary to that expressed by the parties' in the terms of their written contract."  *Savedoff v. Access Group, Inc.*, 524 F.3d 754, 763 (6th Cir. 2008) (quoting *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 219 (2003)).  Where the terms in an existing contract are clear and unambiguous, a court cannot in effect create a new contract by finding an intent not expressed in the clear language employed by the parties.  *Blosser v. Enderlin*, 113 Ohio St. 121 (1925), paragraph one of the syllabus; *Fidelity & Cas. Co. of New York v. Hartzell Bros. Co.*, 109 Ohio St. 566, 569 (1924).

"Contractual terms are ambiguous if the meaning of the terms cannot be deciphered from reading the entire contract or if the terms are reasonably susceptible of more than one interpretation."  *Lewis v. Mathes*, 161 Ohio App.3d 1, 8-9 (2005).  If, as the County now claims, it intended to eventually service all of the Village to the exclusion of any other entity, it could have included terms to that effect in the 1998 Agreement.  Silence on a particular issue does not

13

(4:09CV0249)

render a contract ambiguous.  *PepsiCo v. Central Inv. Corp.*, 271 F. Supp.2d 1040, 1052 (S.D. Ohio 2001).  "Silence only creates an ambiguity where the contract is silent on issues necessary to construe the written agreement's written provisions." *Id.* (applying New York law); *Pierron v. Pierron*, Nos. 07CA3153, 07CA3159, 2008 WL 746948, at *3 (Ohio App. 4th Dist. March 13, 2008) ("mere silence on an issue or a failure to address it does not create an ambiguity where none otherwise exists").  "Nothing is to be added to what the text states or reasonably implies. [] That is, a matter not covered is to be treated as not covered."  ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 93 (THOMSON/WEST 2012) (describing omitted-case cannon).[8]

Without identifying any language of the 1998 Agreement that the City violated by contracting with the Village, the County has failed in its burden of proving it is entitled to relief on its Fifth Cause of Action.  Therefore, the City, not Plaintiff, is entitled to summary judgment on this claim.

**4.  Whether the County is entitled to protection under 7 U.S.C. § 1926(b).**

Finally, the City argues the County cannot establish that it has water lines within or adjacent to Lordstown's east side or that it has a legal right to provide service to that area. Plaintiff's speculative plans to service Lordstown's east side do not qualify it for protection under 7 U.S.C. §1926(a)(1).

---

[8] "Whatever temptations the statesmanship of policymaking might wisely suggest, construction must eschew interpolation and evisceration. [The judge] must not read in by way of creation."  SCALIA & GARNER, *supra*, quoting Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 COLUM.L.REV. 527, 533 (1947) (alteration in original).

(4:09CV0249)

The Secretary of Agriculture is authorized to make or insure loans to local rural water associations for water conservation, use, development and control projects. Pursuant to 7 U.S.C. §1926(a)(1), "The Secretary [of the USDA] is . . . authorized to make or insure loans to associations, including . . . public . . . agencies . . . to provide for . . . the installation or improvement of . . . waste disposal facilities . . . or other aid in planning projects for such purposes." In order to protect the United States' interest in getting repaid for such loans, Congress provided the following anti-curtailment provision:

> The service provided or made available through any such association shall not be curtailed or limited by inclusion of the area served by such association within the boundaries of any municipal corporation or other public body, or by the granting of any private franchise for similar service within such area during the term of such loan . . . .

7 U.S.C. §1926(b).

For § 1926(b) protection to apply, the association must: (1) be an "association" within the meaning of the statute; (2) have qualifying outstanding loan obligations; and (3) have provided or made service available in the disputed area. *Lexington-S. Elkhorn Water Dist. v. City of Wilmore*, 93 F.3d 230, 234 (6th Cir. 1996); *Ross County Water Co., Inc. v. City of Chillicothe*, 666 F.3d 391, 397 (6th Cir. 2011); *Village of Grafton*, 316 F. Supp.2d at 575. It is undisputed that: (1) the County is an "association" for purposes of the statute; (2) Plaintiff has qualifying loans; and, (3) the County had no sewer customers within the ESSP service area. Therefore, the only issue in dispute is whether the County has made service available in the ESSP service area. ECF No. 72 at PageID #: 2734.

15

(4:09CV0249)

In *Lexington-S. Elkhorn*, the Sixth Circuit adopted a two-prong test to determine whether the association has established that it has provided or made service available in the disputed area. The first requirement is the "pipes in the ground" requirement.  The Court of Appeals stated that "[i]f an association does not already have service in existence, *water lines must either be within or adjacent to the property* claimed to be protected by Section 1926(b) prior to the time an allegedly encroaching association begins providing service in order to be eligible for Section 1926(b) protection." *Id.* at 237 (emphasis added).  The second requirement is that the water district must have the legal right under state law to serve the disputed area in question.  *Id.* at 235-36; *Le-Ax Water Dist. v. City of Athens*, 346 F.3d 701, 706 (6th Cir. 2003).

The Court holds that Plaintiff has not satisfied the third element for § 1926(b) protection to apply because Plaintiff had not provided sewer service or made service available to the ESSP service area, and thus is not entitled to § 1926(b) protection.  The County has not shown that it had adequate facilities either within or adjacent to the area to service Lordstown's east side.  It would take a year or more for the County to construct sewers to service the ESSP service area. *See* ECF No. 77-1 at PageID #: 3526, ¶ 10.  Extensive connecting sewers and laterals and appurtenances would have to be designed and constructed in order for the LIS to be used to make service available in the ESSP service area.  *See Northern Ohio Rural Water v. Erie County Board of Commrs.*, 347 F. Supp.2d 511, 515 (N.D. Ohio 2004) (Carr, J.) (water district was not entitled to protection under § 1926(b) because it could not satisfy the third criterion).  Furthermore, the County also lacks a legal right under state law to construct, own, and operate additional sewers

16

(4:09CV0249)

within the Village without first receiving permission from the Village to do so.  *Id.*  Finally, the

Village obtained approval from Ohio EPA before it began construction of the ESSP.

**B.  The Village's Motion for Summary Judgment**

> **1.  Whether the Village has the exclusive right under Article XVIII, Section 4, of the Ohio Constitution and Ohio Rev. Code Ch. 6117 to construct, own and operate sewers within the area serviced by the Village's ESSP.**

Ohio Rev. Code Ch. 6117 governs the interaction of the Village's authority to construct

sewers within its boundaries and the County's rights concerning its preexisting sewer district.

The relevant sections of Ohio Rev. Code Ch. 6117 that impact the Fourth Cause of Action are §§

6117.04, 6117.05, and 6117.06, the language of which has changed somewhat over the years.

The dispute between Plaintiff and the Village under the Fourth Cause of Action centers

on the fact that the Village prepared detail plans for the ESSP extension lines in 2007, and the

County did not approve detail plans for the extension lines before the Township incorporated in

1975.  ECF No. 67-8 at PageID #: 1739-40 (Response to Request for Admission #1) and 1739-51

(Response to Interrogatory #1).  The County's position is that under Ohio Rev. Code §§ 6117.04,

6117.05, and 6117.06 it maintained jurisdiction over the ESSP extension lines because (1) the

County approved both general and detail plans for sewer improvements designed to serve the

eastside portion of the Township before it incorporated in 1975, and (2) the ESSP project was

nothing more than the extension lines needed to sewer the last unsewered area of the Village, and

thus completed the County's improvement begun when the County designed, approved and

constructed the LIS as the backbone of an improvement for the Township before it incorporated.

(4:09CV0249)

On the other hand, the Village's position is that under the terms of these same statutes, the County lost its right to maintain jurisdiction over the ESSP extension lines because (1) the County had not approved general or detail plans specifically for the ESSP when the Township incorporated in 1975, and the Village did not pass a resolution or adopt an ordinance providing the County authority over the construction of the ESSP extension lines.

Section 6117.04 discusses the authority of a county sewer district to construct additional sewers and operate them within the territory of a municipal corporation. When the Village incorporated, this section provided, in relevant part:

> At any time after a district is established comprising or including a part or all of the territory within any municipal corporation, its legislative authority may by ordinance or resolution authorize the board to proceed with the construction or the maintenance, repair and operation of any sewer improvement for local service within such municipal corporation. After such authority has been granted, the board may proceed with the construction or the maintenance and operation of said improvements in the same manner as provided by law for improvements in districts wholly outside of municipal corporations, under the same restrictions as provided in this section for main works.

Ohio Rev. Code § 6117.04 (2000) (showing last amendment effective Oct. 23, 1972) (ECF No. 77-7).

In 2001, the relevant part of the statute was revised to read:

> (A) The acquisition, construction, maintenance, and operation of the facilities shall first be authorized by an ordinance or resolution of the legislative authority of the municipal corporation.

Ohio Rev. Code § 6117.04 (2008), effective March 12, 2001 (ECF No. 77-8).

In 2008, the statute was again revised to read in relevant part:

> The authority of a board of county commissioners to acquire, construct, maintain, and operate sanitary or drainage facilities or prevention or replacement facilities

18

(4:09CV0249)

> for a county sewer district in the territory of a municipal corporation, or a regional
> district established under Chapter 6119. of the Revised Code, that is in whole or
> in part within the county sewer district is the same as provided by law with respect
> to territory within a county sewer district that is wholly outside a municipal
> corporation or a regional district, subject to the following in the case of facilities
> within a municipal corporation:
> (A) The acquisition, construction, maintenance, and operation of the facilities
> shall first be authorized by an ordinance or resolution of the legislative authority
> of the municipal corporation.

Ohio Rev. Code § 6117.04 (current version), effective September 23, 2008.

Although the language of § 6117.04 changed over the years, the concept that the County

needed the Village's permission through resolution or ordinance before it may proceed with the

construction, maintenance or operation of additional sewers within the Village's municipal

boundaries did not change.  The only ordinance or resolution identified by the County which it

claims meets the requirement of § 6117.04 is Village of Lordstown Subdivision Regulation

section 1106.00 (ECF No. 67-4).

Ohio Rev. Code §§ 6117.05 and 6117.06 are at the center of Plaintiff's case, and

represent the Ohio legislature's decision in balancing the rights under the Ohio Constitution and

statutes of a municipality, such as the Village, with the rights of a pre-existing sewer district such

as the County's MSD.  According to the County, under the language of R.C. § 6117.05, as it

existed in 2007 and in 1975, and as interpreted by Ohio's courts, the County maintained authority

over construction of extensions until the LIS's capacity was achieved, the improvement was

completed with sewers extending to all of the service area, or the County abandoned or conveyed

the improvement.

In 1975, Ohio Rev. Code § 6117.05 read in relevant part:

19

(4:09CV0249)

> Whenever any portion of a sewer district is incorporated as, or annexed to, a municipal corporation, the area so incorporated or annexed shall remain under the jurisdiction of the board of county commissioners for sewerage purposes, until *all sewerage improvements for said area*[,] for which detailed plans have been prepared and the resolution declaring the necessity thereof has been adopted by the board[,] *have been completed*, or until the board has abandoned such projects.

ECF No. 77-10 at PageID #: 3655 (emphasis added).  In 1975, Ohio Rev. Code § 6117.06

provided, in relevant part:

> After the establishment of any sewer district the board of county commissioners shall have prepared by the county sanitary engineer a general plan of sewerage and sewage disposal for such district, as complete as can be made at that time.  After such general plan has been approved by the board, it shall have prepared by the sanitary engineer detailed plans, specifications, and estimates of cost of such parts of the improvement as it is necessary to then construct, together with a tentative assessment of the cost based on such estimate.  Such tentative assessment shall be for the information of property owners, and shall not be certified to the auditor for collection.  Such detailed plans, specifications, estimates of cost, and tentative assessment, so prepared by the sanitary engineer and approved by the board, shall be carefully preserved in the office of the board or the sanitary engineer and shall be open to inspection of all persons interested in such improvement.  After approval of the detailed plans, specifications, estimates of cost, and tentative assessment, the board shall adopt a resolution declaring that such improvement, describing the same and the location, route, and termini thereof, is necessary for the preservation and promotion of public health and welfare, designating the character of the materials to be used, referring to the plans, specifications, estimates of cost, and tentative assessments, stating the place where they are on file and may be examined, the estimated cost of the maintenance of such improvement for one year, and what part of the cost will be paid by the county at large and what part will be specially assessed against the benefited property within the district.  Such resolution shall also contain a description of the boundaries of that part of the district to be assessed, and shall designate a time and place, to be fixed by the board, when and where objections to the improvement, to the tentative assessment, or to the boundaries of the assessment district will be heard by the board.  The date of such hearing shall be not less than twenty-four days after the date of the first publication of such resolution.  The board shall publish such resolution once a week for two consecutive weeks in a newspaper of general circulation within the county, and on or before the date of the second publication shall send by mail a notice of the time and place of such hearing to every owner of property to be assessed for such improvement whose address is known, which

20

(4:09CV0249)

notice shall state that the property of the addressee will be assessed for such improvement.

ECF No. 77-11 at PageID #: 3661-62.[9]  Section 6117.06, as it existed in 1975, provided more specificity concerning the detailed plans and the resolution to which § 6117.05 referred.

Although Plaintiff claims that the version of the statutes as they existed in 1975 is not relevant, it also claims at PageID #: 2731-32 of ECF No. 72, that the detailed plans concerning the LIS, which was constructed in the mid-1960s, qualify under the reading of Ohio Rev. Code § 6117.05 as it existed in 1975.  The Court agrees with the Village that Plaintiff's interpretation does violence to the language of § 6117.05.  *See* ECF No. 77 at PageID #: 3503.  The statute as it existed in 1975 requires both detailed plans of the sewerage improvements, and a resolution declaring the necessity of constructing the improvements.  It then indicates that the County's jurisdiction over the area terminates when the improvements have been completed.  The County's interpretation of § 6117.05 effectively reads those provisions out of the statute, resulting in continued jurisdiction of the County for sewerage purposes until "all sewerage improvements for said area . . . have been completed."  That would mean that the Village would never gain jurisdiction to construct, own and operate sewers within the territory of the municipality.

As of 1975, when the Village was incorporated, the balance between the Village's rights established under the Ohio Constitution and statutes, and the rights of the pre-existing County MSD was that if the County had sewerage projects underway for which it had detailed plans, and

---

[9]  This provision was in effect in 1978.  Section 6117.06 was later amended, effective Sept. 21, 1984.  *See* ECF No. 77-10 at PageID #: 3655-56.

(4:09CV0249)

had adopted a resolution declaring the necessity of constructing that project, the County could complete that project. Thereafter, the County's construction of or operation of any additional sewerage improvements within the Village was dependent upon the municipality granting the County permission to construct, own and operate the additional sewers.

In *Ottawa Cty. Bd. of Commrs. of v. Marblehead*, 86 Ohio St.3d 43 (1999), the Board of County Commissioners of Ottawa County filed a declaratory judgment action to determine the right of the Village of Marblehead to provide water service to residents of annexed county land. The Ohio Supreme Court declined to find that Article XVIII of the Ohio Constitution confers absolute authority on a municipality to construct and maintain a water supply system within its borders and to contract for water services for its residents. Instead, it found that the county water district statute at issue, Ohio Rev. Code § 6103.04[10] permits an established county sewer district to complete an existing county water service project when territory within the project area acquires municipality status through annexation during the pendency of the county project. Justice Cook, writing for the majority, stated: "[a]lthough Article XVIII of the Ohio Constitution grants municipalities the exclusive authority to provide their residents with utility services, a statute that limits the municipality's power is not unconstitutional if the purpose of the statute is an exercise of the state's police powers and is not a substantial infringement upon the municipality's authority." *Id.* at 44-45. The Court balanced the interests of the parties and held that § 6103.04 was a valid exercise of the state's police power that did not substantially interfere with a municipality's constitutional authority to operate utilities. *See id.*, at 45.

---

[10] Section 6103.04 contained language similar to § 6117.05 as it existed in 1975.

22

(4:09CV0249)

It is significant that the Ohio Supreme Court in *Marblehead* stated that § 6103.04 intended to permit completion of "*pending* county water service projects." *Id.* at 47 (emphasis added). That is not what the County seeks to do in the case at bar. Plaintiff focuses upon the residual capacity of the LIS, but the construction of that project was completed in the mid-1960s. In addition, the Ohio Supreme Court did not state that any statute enacted to promote health, safety and welfare trumps the municipality's authority under Article XVIII of the Ohio Constitution. Rather, such a statute must not substantially interfere with the municipality's constitutionally granted power.

In 2001 and again in 2008, Ohio Rev. Code §§ 6117.05 and 6117.06 were amended. The language and structure of § 6117.05 changed somewhat. Section 6117.05 currently reads in relevant part:

> (A) Whenever any portion of a sewer district is incorporated as, or annexed to, a municipal corporation, *the area so incorporated or annexed shall remain under the jurisdiction of the board of county commissioners for purposes of the acquisition and construction of sanitary and drainage facility and prevention or replacement facility improvements until all of those improvements for the area for which a resolution described in division (A) or (E) of section 6117.06 of the Revised Code has been adopted by the board have been acquired or completed* or until the board has abandoned the improvements. The board, unless and until a conveyance is made to a municipal corporation in accordance with division (B) of this section, shall continue to have jurisdiction in the area so incorporated or annexed with respect to the management, maintenance, and operation of all sanitary and drainage facilities and prevention or replacement facilities so acquired or completed, or previously acquired or completed, including the right to establish rules and rates and charges for the use of, and connections to, the facilities. . . . (Emphasis added).

Beginning with 2001, § 6117.05 was keyed to completion of the improvements for which

23

(4:09CV0249)

resolutions described in divisions (A) or (E) of § 6117.06 have been adopted by the board of

county commissioners.

> Section 6117.06 currently provides, in relevant part:
>
> (A) After the establishment of any sewer district, the board of county commissioners, if a sanitary or drainage facility or prevention or replacement facility improvement is to be undertaken, may have the county sanitary engineer prepare, or otherwise cause to be prepared, for the district, or revise as needed, a general plan of sewerage or drainage that is as complete in each case as can be developed at the time and that is devised with regard to any existing sanitary or drainage facilities or prevention or replacement facilities in the district and present as well as prospective needs for additional sanitary or drainage facilities or prevention or replacement facilities in the district.  After the general plan, in original or revised form, has been approved by the board, it may adopt a resolution generally describing the improvement that is necessary to be acquired or constructed in accordance with the particular plan, declaring that the improvement is necessary for the preservation and promotion of the public health and welfare, and determining whether or not special assessments are to be levied and collected to pay any part of the cost of the improvement.
>
>         *   *   *
>
> (E) After complying with divisions (A), (C), and (D) of this section, the board may adopt a resolution declaring that the improvement, which shall be described as to its nature and its location, route, and termini, is necessary for the preservation and promotion of the public health and welfare, referring to the plans, specifications, estimate of cost, and tentative assessment, stating the place where they are on file and may be examined, and providing that the entire cost or a lesser designated part of the cost will be specially assessed against the benefited properties within the district and that any balance will be paid by the county at large from other available funds. . . .

Plaintiff, however, has not identified a resolution as specified in § 6117.06(A) describing

uncompleted sewers within the ESSP service area, such as the collecting and lateral sewers

necessary to actually provide sewer service to the residents and businesses of that area.  Instead

of identifying a resolution as specified in § 6117.06(A) , Plaintiff argues the General Assembly

intentionally added language to the statute that clarified that the jurisdiction of the board of

(4:09CV0249)

county commissioners extends beyond the date of completion of a pending project, to include all improvements for the area for which a general plan or detail plan has been approved, with the instruction that general plans, to the extent possible, be "forward thinking," in order to address the prospective needs for the service area; and the LIS was designed to serve those prospective needs in the ESSP service area.  ECF No. 72 at PageID #: 2730.  That argument ignores the language of § 6117.05 keyed to a "resolution" of the board of county commissioners enacted pursuant to § 6117.06(A) or (E).

Plaintiff also has not identified a resolution for uncompleted sewers as specified in § 6117.06(E).

Plaintiff argues that U.S. District Judge Polster addressed the analogous issue under Ohio Rev. Code Ch. 6119 in the context of a Chapter 6119 regional water and sewer district in the Village of Grafton case.  ECF No. 72 at PageID # 2727.  Because the legal issue concerning the respective rights of the County and the Village after the Village's incorporation in 1975 is dependent upon the language of §§ 6117.04, 6117.05, and 6117.06, the fact that the Village of Grafton case does not address that language is precisely why it is irrelevant to the issues in the case at bar.

Plaintiff also cites City of Northwood v. Wood Cty. Regional Water & Sewer Dist., No. WD-97-010, 1998 WL 46390 (Ohio App. 6th Dist. Jan 30, 1998), rev'd on other grounds, Northwood v. Wood Cty. Regional Water & Sewer Dist., 86 Ohio St.3d 92 (1999) in support of its interpretation of § 6117.05.  ECF No. 72 at PageID #: 2725-26.  In that case, the Wood County Commissioners formed a sewer district in 1965 that included the Village of Northwood,

25

(4:09CV0249)

which incorporated on September 8, 1962.  The County then constructed water and sewer lines in the district, including lines inside Northwood, and then converted the sewer district into a regional water and sewer district in 1992.  In 1995, Northwood sought to construct its own water and sewer lines to serve a new plant to be built by Alcoa Automotive Structures, Inc. in the village, without first obtaining approval from the District.  The District filed an action for declaratory and injunctive relief, and the trial court enjoined Northwood from constructing the lines without the District's approval and without tapping into the District's lines.  Northwood then appealed and the District filed notices of cross-appeal.  Northwood asserted, among other assignments of error, "that the trial court erred in finding that the district owns the mains passing through Northwood; . . . that the trial court erred in holding that Northwood relinquished control of the lines to the district; and that the trial court erred in finding that the district has superior interests in maintaining the integrity of the system and, thus, has the right to own and control the system."  Northwood argued that its incorporation in 1962 required the termination of Wood County's jurisdiction over all water and sewer lines within Northwood's geographical boundaries.  Finding no merit in these assignments of error and argument, the Ohio Court of Appeals summarily held "[e]ven if, assuming *arguendo*, that all the lines at issue did exist when Northwood was incorporated, R.C. 6103.04, 6117.05, 6103.22 and 6117.42 provide no support for Northwood's argument."  *City of Northwood*, 1998 WL 46390, at *11.

Finally, Plaintiff cites the Ohio Supreme Court's decision in *Northwood v. Wood Cty. Regional Water & Sewer Dist.*, 86 Ohio St.3d 92 (1999), an eminent domain case, in support of its argument that "[t]he Ohio Supreme Court [has] held that [the] exercise of municipal powers

26

(4:09CV0249)

will be enjoined if it causes, or threatens to cause, the economic destruction of a sewer district."

ECF No. 72 at PageID #: 2741.  That statement is broader than the actual holding of the Ohio

Supreme Court, which is found in its syllabus as follows:  "A taking may be enjoined if it will

result in the destruction of an existing public use or the destruction, including economic

destruction, of an existing public utility operated by a municipality or political subdivision."

*Northwood*, 86 Ohio St.3d at 92.  As pointed out by the Village, the County never lost the

residents and businesses located within the ESSP service area as customers because it never had

them.  Consequently their non-existent "loss" could not result in the economic destruction of the

County's MSD.

The Court holds that because the County had not prepared detailed or particular plans for

the construction of collecting and lateral sewers within the ESSP service area and had not

adopted a resolution declaring the necessity of constructing them before the Village was

incorporated in 1975, the Village has the exclusive right to acquire, construct, maintain and

operate such sewers within the ESSP service area.

Given this holding regarding the Fourth Cause of Action, the Court will also enter

summary judgment in favor of the Village on Plaintiff's Third Cause of Action.  In the Third

Cause of Action, Plaintiff seeks declaratory relief regarding the impact of the ERCOG General

Policy Board Resolution, dated July 31, 2006 (ECF No. 67-48), amending the Clean Water Act §

208 Area Wide Water Quality Management Plan.  Plaintiff requests that the Court conclude that

the Resolution had no impact on the County's rights under Ohio Rev. Code § 6117.05 over the

planning, construction, and subsequent ownership, operation and maintenance of the ESSP

27

(4:09CV0249)

extension lines.  ECF No. 72 at PageID #: 2741.  But, Plaintiff has not demonstrated that, solely

because of this Resolution, it is subject to "actual present harm or a significant possibility of

future harm" that is not already being addressed somewhere else in this action, *i.e.*, the Fourth,

Fifth, and Sixth Causes of Action.  *Fieger v. Ferry*, 471 F.3d 637, 643 (6th Cir. 2006) (quoting

*Peoples Rights Org., Inc. v. City of Columbus*, 152 F.3d 522, 527 (6th Cir. 1998)).

**2.  Whether any contract between the Village and the County affects the Village's right to construct, own and operate the ESSP.**

There are no written contracts adopted by or authorized by Village Council through

resolution or ordinance between the County and the Village restricting the Village's exclusive

right to acquire, construct, maintain and operate sewers within the ESSP service area.

There is a well-defined procedure that the Village Council must follow to enact

legislation and to enter into contracts.  In the case of villages, "[a]ll contracts made by the

legislative authority of a village shall be executed in the name of the village and signed on its

behalf by the mayor and clerk. . . ."  Ohio Rev. Code § 731.14.  The courts have strictly

interpreted this provision.  *See e.g.*, *Kinney v. The Personal Serv. Ins. Co.*, No. CA-434, 1993

WL 218386, at *1 (Ohio App. 5th Dist. May 12, 1993) (written rejection of

uninsured/underinsured motorist coverage under village's policy was ineffective because it did

not carry the signatures of both the mayor and the village clerk).

**3.  Whether the Village's actions concerning the ESSP are prohibited by *Northwood v. Wood Cty. Regional Water & Sewer Dist.*, 86 Ohio St.3d 92 (1999).**

28

(4:09CV0249)

The Village argues its actions concerning the ESSP do not include the use of its eminent domain rights concerning the County's MSD, and are not subject to *Northwood v. Wood Cty. Regional Water & Sewer Dist.*, 86 Ohio St.3d 92 (1999). The Court agrees.

**4.  Whether the Village's actions concerning the ESSP violate 7 U.S.C. § 1926(b).**

Lastly, the Village argues its actions concerning the ESSP are not prohibited by § 1926(b) for three (3) reasons. First, under state law the County has no right to acquire, construct, own or maintain sewers within the Village's ESSP service area. Second, it is undisputed that the County could not make sewer service available within the ESSP service area within a reasonable period of time. Third, the County, by policy, is unwilling to pay to make service available within the ESSP service area. The Village has made substantial investments in planning, EPA approvals, construction, and service to the ESSP service area.

The Court has addressed this argument in Section A.4., *supra*.

**5.  Whether Plaintiff is entitled to the injunctive relief against the Village and the City requested in the Seventh Cause of Action.**

In its Seventh Cause of Action, Plaintiff requests injunctive relief barring the Village and the City from taking any actions which contradict or are inconsistent with the declarations to be entered by the Court. ECF No. 1-2 at ¶¶ 59-61. The Court will not enter an injunction because it finds that Plaintiff is not entitled to relief concerning the underlying state or federal substantive claims.

**C.  Plaintiff's Motion for Summary Judgment**

According to Plaintiff, the adoption of counterpart ordinances by the County and the Village for the construction of sewers in the Village, the development of a standardized sewer

29

(4:09CV0249)

extension agreement, and the execution of 16 subsequent extension agreements spanning almost

25 years, collectively constitute an agreement that governs all sewer extension projects.  Citing

implied-in-fact contract case law, Plaintiff initially argues that it is a settled principle of contract

law in Ohio that an agreement between two parties can exist through a series of written

documents accompanied by conduct by both parties that is consistent with their agreement.  ECF

No. 72 at PageID #: 2710-11.  The City correctly responds that Ohio law has been clear for over

a century that a municipality cannot be held liable on an implied contract. *Village of Eastlake v.*

*Davis*, 94 Ohio App. 71, 74-75 (1952) (citing precedent therein).  ECF No. 77 at PageID #: 3489-

94.

> **1.  Whether Ohio Rev. Code  § 6117.05 preserved to Plaintiff the right to provide
> sewer service to the last remaining unsewered area of Lordstown (*i.e.*, the eastside)
> via extension of sewer lines branching from the County's LIS.**

Plaintiff argues the agreement of the County, the Village and the City to change the

destination for transport of sewage from the ESSP area from Mahoning County's treatment plant

to the City's treatment plant had no impact on Plaintiff's rights under § 6117.05, but just

removed a procedural obstacle, so that the extension lines could connect to the LIS, just like all

previous extensions constructed in the Village had connected, and thus Plaintiff is entitled to a

declaration from the Court to that effect (Third Cause of Action).

The Court has addressed this argument in Section B.1., *supra*.

In *City of Northwood v. Wood Cty. Regional Water & Sewer Dist.*, No. WD-97-010, 1998

WL 46390 (Ohio App. 6th Dist. Jan 30, 1998), *rev'd on other grounds*, *Northwood v. Wood Cty.*

*Regional Water & Sewer Dist.*, 86 Ohio St.3d 92 (1999), The .

30

(4:09CV0249)

> *Bd. of County Comm'rs of Ottawa Cty. v. Village of Marblehead*, 86 Ohio St.3d 43 (1999).

> **2. Whether Lordstown's subdivision ordinance and 16 previous agreements executed with Plaintiff constituted binding obligations upon the Village.**

Fouty v. Ohio Dep't of Youth Servs., 167 Ohio App.3d 508 (2006) .

Section1106.00 of the Village's subdivision regulations provides in pertinent part:

> The Sanitary Engineer of Trumbull County is responsible for overseeing the design, review, construction, inspection and enforcement of all public sanitary sewer line installations. . .  A professional engineer must design all plans for . . . wastewater facilities in accordance with the specifications of the Trumbull County Sanitary Engineers . . .  These plans shall be approved by the Trumbull County Sanitary Engineer . . . and the Ohio Environmental Protection Agency.  No construction of improvements shall commence until . . . a "Permit to Install" has been received from the Trumbull County Sanitary Engineer and the Ohio EPA.
> Before any subdivision plat is signed off for final approval, the developer shall have met all the terms of the private extension agreement with the *Village of Lordstown Council*. . .  A separate agreement and maintenance bond are required for each sanitary sewer . . . extension. . . .

ECF No. 67-4 (italics in original).[11]  Plaintiff argues that when the Village embarked upon the

ESSP without submitting the plans to the County for review and approval under § 1106.00,

without entering into an extension agreement for the project, and by commencing construction

without the prior approval of the County, the Village breached an agreement with the County.

According to Plaintiff, the Village further breached the agreement when it entered into two

separate treatment and O&M services contracts with the City in 2007 and 2009 for the new ESSP

---

[11]  Section 1106.00 of the Village's subdivision regulations is almost identical to its counterpart codified at Section 600.00 of the County's subdivision regulations (ECF No. 67-5).

(4:09CV0249)

service area.  ECF No. 72 at PageID #: 2713.  Plaintiff contends it is entitled to an entry of

judgment under the Sixth Cause of Action stating that the Village breached its agreement with

the County, enjoining the Village from taking further acts inconsistent with the agreement, and

awarding damages to the County.  ECF No. 72 at PageID #: 2714.

> **3.  Whether the City breached the 1998 Agreement between it and Plaintiff for sewer outlet privileges when the City executed two contracts in 2007 and 2009 with the Village to provide sewer outlet privileges and O&M services for sewer lines to be built by the Village in the same services areas that were covered by the 1998 Agreement.**

According to Plaintiff, the 1998 Agreement delineated a specific geographic area inside

the County's MSD from which the City would accept wastewater for treatment and disposal from

the MSD's customers delivered to Warren in County-owned sewer lines.  The 1998 Agreement

has pricing limits.  Plaintiff requests that the Court declare the 2007 Agreement and the 2009

O&M Contract null and void and award it attorney's fees and costs.  ECF No. 46 at PageID #:

976.

The 1998 Agreement provides, in pertinent part:

> WHEREAS, the City has in the past accepted and treated sewage flows generated in the County sewer subdistricts known as Lordstown and Warren-Champion, as shown respectively on the attached Exhibit "A" and Exhibit "B" . . .; and
>
> WHEREAS, all sewage flows generated in said . . . sewer subdistricts are transported in County-owned, operated and maintained sewer systems until being metered prior to their entry into the sewerage system owned, operated, and maintained by the City; and
>
> WHEREAS, both the County and the City are desirous of continuing to have the sewage flows from said . . . sewer subdistricts:  metered as they enter the sewerage system owned by the City; conveyed to treatment; and treated by the City's Water Pollution Control Center . . .; and
>
> WHEREAS, both the County and the City are desirous of rescinding . . . the . . . 1987 [Agreement] . . . and replacing it with this Agreement . . .; and

32

(4:09CV0249)

          WHEREAS, the County, acting under the authority of Ohio Revised Code Sections 6117.01 et. seq., and the City, acting pursuant to Article XVIII of the Ohio Constitution, are . . . authorized to enter into this Agreement;

          NOW, THEREFORE, in consideration of the premises . . . contained herein, it is mutually agreed by and between the City and the County as follows:

ECF No. 46-8 at PageID #: 1054-55.  Plaintiff argues that this language represents the "exclusivity clause" that the City contends does not exist in the contract.  ECF No. 60 at PageID #: 1274.  In support of its position that "whereas clauses" are to be construed as an important indication of the parties' intent and motivation in entering an agreement, Plaintiff cites *City of Aurora v. City of Bay Village*, 27 Ohio App.2d 17, 21 (1971).  *See also Fox v. Fox*, No. 01AP-83, 2002 WL 722804, at *8 (Ohio App. 10th Dist. April 25, 2002) ("[I]t is plain that [whereas clauses] are frequently intended to, and often do, shed light on the circumstances the parties wished to have considered in the interpretation of the main body of the contract.").[12]  ECF No. 60 at PageID #: 1273.

      The Court finds that the 1998 Agreement does not prohibit the City from accepting wastewater for treatment and disposal from the Village's ESSP collection system.  The City is not required by the 1998 Agreement to accept wastewater only through the County's collection system.  It is true that all flows from the designated areas of the County's subdistricts were delivered to the City's sewer collection system via the County's sewer collection system when this contract was executed in 1998.  But, that changed after the City entered into the 2007

---

    [12]  The court noted, however, that "[o]ne commentator, in considering their use, has stated that, "[t]raditionally prefixed by the word *whereas*, contract recitals are not ordinarily drafted as promises or conditions."  Farnsworth, Contracts (1982) 495, Section 7.10."  *Id.* (italics in original).

(4:09CV0249)

treatment contract with the Village (ECF No. 46-6) and began accepting effluent and sewage via

independent sewer lines constructed by the Village that connect directly to the City's treatment

plant.

**4.  Whether Defendants' actions curtailed Plaintiff's sewer service rights in Lordstown while USDA loans remained pending for the County's sewer district, in violation of 7 U.S.C. § 1926(b) and 42 U.S.C. § 1988.**

In *Village of Grafton*, Judge Polster stated:

Federal courts have uniformly held that § 1926(b) establishes a ''bright line rule'' which unambiguously prohibits the curtailment of a federally indebted water association's service by any form of municipal encroachment, and that any doubts about whether a water association is entitled to § 1926(b) protection should be resolved in favor of the federally indebted water association.

*Village of Grafton*, 316 F. Supp.2d at 574.  Plaintiff contends that a contractual relationship is

sufficient to establish a violation of 7 U.S.C. § 1926(b).  In *Adams Cty. Regional Water Dist. v.*

*Village of Manchester*, 226 F.3d 513, 518 (6th Cir. 2000), plaintiff-appellant was a rural water

district operating under the authority of Ohio Rev. Code Ch. 6119.  The Sixth Circuit held that

when the Village of West Union contracted with Manchester for the immediate sale of water, it

violated § 1926(b) by encroaching on the District's service authority.

For the reasons discussed in Sections A.4. and B.4., *supra*, the Court concludes that the

actions of the City and the Village did not curtail Plaintiff's sewer service rights in Lordstown

while USDA loans remained pending for the County's MSD, in violation of 7 U.S.C. § 1926(b)

and 42 U.S.C. § 1988.

**5.  Whether Defendants' actions are tantamount to destruction of the County's sewer district and must therefore be enjoined.**

(4:09CV0249)

Plaintiff argues the contractual actions taken by Defendants violate the Ohio Supreme Court's prohibition against acts by municipalities that are tantamount to destruction of a sewer district.  Plaintiff contends that under Ohio Rev. Code §§ 6117.04-.06 it maintained jurisdiction over the ESSP extension lines because it approved general and detail plans for sewer improvements designed to serve the entire Township before the Village incorporated in 1975, and the ESSP project was nothing more than the last extension lines needed to sewer the last unsewered area of the Village.  According to Plaintiff, the Village's interpretation of § 6117.05 would mean that any Ohio county that, for example, makes a major multi-million dollar investment in the construction of the backbone for a large sewer improvement would lose its authority and jurisdiction over all construction of extension lines to connect to the backbone if, on the first day after the construction of the backbone is completed, the surrounding area incorporates or is annexed to a neighboring municipality.  Plaintiff asserts the actions of the Village and the City curtailed its service rights inside its own sewer district to both existing and new customers, frustrating important policies embodied within the protection afforded under § 1926(b), and creating the same risks that Judge Polster found objectionable when he ruled in favor of the water district in the *Grafton* decision.  316 F. Supp.2d 568.

For the reasons set forth in Sections A.2 and B.1., *supra*., the Court finds this argument to be lacking in merit.

(4:09CV0249)

### IV. Conclusion

Viewing Plaintiff's probative evidence and all reasonable inferences drawn therefrom in the light most favorable to Plaintiff,

Defendant City of Warren's Motion for Summary Judgment (ECF No. 40) is granted;

Plaintiff's Motion for Summary Judgment Against the City of Warren (ECF No. 46) is denied;

Plaintiff's Modified Motion for Summary Judgment Against the Village of Lordstown, Ohio (ECF No. 72) is denied; and

Defendant Village of Lordstown, Ohio's Motion for Summary Judgment (ECF No. 77) is granted.

IT IS SO ORDERED.


 August 1, 2014                              /s/ Benita Y. Pearson
Date                                        Benita Y. Pearson
                                            United States District Judge

36